**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

GENERAL MOTORS LLC,

        Plaintiff,

vs.

KAR AUTO GROUP OF DECORAH,
INC., d/b/a DECORAH CHEVROLET
CADILLAC,

        Defendant.

No. 20-CV-2039-CJW-KEM

**MEMORANDUM OPINION
AND ORDER**

_____

**TABLE OF CONTENTS**

I.     BACKGROUND ............................................................................... 3

II.    APPLICABLE LAW ....................................................................... 5

III.   ANALYSIS...................................................................................... 5

    A.    Irreparable Harm...................................................................... 5

        1.    Operational Issues ......................................................... 7

            a.    Sales and Service Space ......................................... 7

            b.    Contractual Provisions..........................................14

        2.    Commoditization and Dilution.......................................15

            a.    Commoditization ..................................................15

   b.  Trademark Dilution ................................................16

  3.  Other Franchises .......................................................17

 B.  Likelihood of Success on the Merits ...........................................18

  1.  Breach of Contract....................................................19

  2.  Trademark Claim ......................................................21

 C.  Balance of Harms ......................................................22

 D.  Public Interest ..........................................................23

IV. CONCLUSION ...............................................................24

This matter is before the Court on plaintiff's Motion for Preliminary Injunction. (Doc. 15).  Defendant timely resisted (Doc. 18) and plaintiff timely replied to the resistance (Doc. 20).  The Court held a telephonic oral argument on July 29, 2020.  (Doc. 21).  For the following reasons, plaintiff's Motion for Preliminary Injunction is **denied**.

## I.     BACKGROUND

The Court's factual findings are based on plaintiff's complaint and the parties' sworn declarations and exhibits submitted in support of their positions.  The Court's factual findings here are provisional and not binding in future proceedings.  *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[F]indings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."); *SEC v. Zahareas*, 272 F.3d 1102, 1105 (8th Cir. 2001) (same).  Affidavits submitted at the preliminary injunction phase need not meet the requirements of affidavits under Rule 56(c)(4), but the Court may consider the "competence, personal knowledge and credibility of the affiant" in determining the weight to give the evidence.  *Bracco v. Lackner*, 462 F. Supp. 436, 442 n.3 (N.D. Cal. 1978) (citing 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2949)).  The Court will discuss additional facts as they become relevant to the Court's analysis.

Plaintiff General Motors, LLC, ("plaintiff") is a manufacturer and distributor of motor vehicles.  (Doc. 14, at 2).  Defendant KAR Auto Group of Decorah, Inc., d/b/a/ Decorah Chevrolet Cadillac ("defendant") is an automobile dealer in Decorah, Iowa.  (*Id.*, at 1-2).  In 2003, defendant entered into two dealer sales and service agreements (the "Agreements") with plaintiff.  (Docs. 15-3; 15-4; 18-1, at 2).  Under the Agreements, defendant was authorized to sell and service two General Motors "line-makes" of vehicles, namely Chevrolet and Cadillac, from the premises identified in the Agreements (the "GM dealership").  (Docs. 15-1, at 3; 18-1, at 2).  Defendant formerly operated a separate automobile dealership adjacent to their GM dealership.  (Docs. 15-

1, at 4; 18-1, at 2-3). The adjacent dealership (the "CDJR dealership") sold the Chrysler, Dodge, Jeep and Ram ("CDJR") line-makes, which are manufactured by Fiat Chrysler. (*Id.*). On February 1, 2020, the entity operating the CDJR dealership merged into defendant. (Doc. 18-1, at 2). On June 10, 2020, defendant merged its CDJR operations into the GM dealership operations. (*Id.*, at 11; Doc. 15-14). The combination of line-makes from different manufacturers at a single dealership is called "dualing." (Docs. 14, at 8 n.2; 18-1, at 3).

Plaintiff filed its complaint on June 9, 2020, (Doc. 1) and amended its complaint on July 1, 2020 (Doc. 14). Plaintiff's amended complaint asserts two breach of contract claims seeking specific performance and money damages, respectively. (*Id.*, at 16-20). Plaintiff alleges defendant breached the Agreements because defendant did not provide the required information or obtain plaintiff's permission before adding the CDJR line-makes to the GM dealership. (*Id.*, at 3-4, 16-17). Plaintiff also asserts that the dualed operation results in defendant conducting GM operations at an unapproved location without the contractually required amount of space for GM sales and service. (Doc. 14 at 3-4, 16-17). Plaintiff also claims defendant's continued use of plaintiff's trademarks, such as the Chevrolet and Cadillac logos, infringes on plaintiff's trademarks under Title 15, United States Code, Section 1125(a). (*Id.*, at 20-21).

After filing its amended complaint, plaintiff moved for a preliminary injunction. (Doc. 15). Plaintiff requests that the Court (1) enjoin defendant from operating the GM dealership away from the GM dealership premises and (2) enjoin defendant from conducting CDJR operations from the GM dealership premises. (*Id.*, at 3-4). The removal of the CDJR line-makes from the GM dealership is referred to as "de-dualing." (Doc. 18-1, at 11).

## II. APPLICABLE LAW

The requirements for a preliminary injunction are well established:

> When determining whether to issue a preliminary injunction, the district court should consider "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other party litigants; (3) the probability that movant will succeed on the merits; and (4) the public interest."

*Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp., LLC,* 953 F.3d 1041, 1044 (8th Cir. 2020) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). The movant bears the burden of establishing the propriety of a preliminary injunction. *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995). "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis original) (quoting 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948 (2d ed. 1995)). "[T]he burden on the movant is heavy, in particular where . . . 'granting the preliminary injunction will give [the movant] substantially the relief it would obtain after a trial on the merits.'" *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998) (second alteration in original) (quoting *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 486 (8th Cir. 1993)).

## III. ANALYSIS

Because the absence of irreparable harm is fatal to a motion for preliminary injunction, the Court will first address the threat of irreparable harm. The Court will then discuss the remaining *Dataphase* factors. *See* 640 F.2d at 114.

### A. Irreparable Harm

"[T]o warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm." *Wachovia Secs., L.L.C. v. Stanton*, 571 F. Supp.

2 d 1014, 1044 (N.D. Iowa 2008) (citation omitted). The movant must show more than the mere possibility that irreparable harm will occur. Rather, the movant must show it is "likely to suffer irreparable harm in the absence of preliminary relief[.]" *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Thus, "[s]peculative harm does not support a preliminary injunction." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012); *see also Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) ("[T]o demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." (quoting *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir.1996))). "The failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction[.]" *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

Plaintiff alleges defendant's addition of the CDJR line-makes to the GM dealership will damage plaintiff's "image and goodwill." (Doc. 15-2, at 17). The "loss of intangible assets, such as reputation and goodwill" can constitute a form of irreparable harm. *TrueNorth Cos., L.C. v. TruNorth Warranty Plans of N. Am., LLC*, 353 F. Supp. 3d 788, 800 (N.D. Iowa 2018) (citation omitted). Plaintiff alleges that by defendant adding the CDJR line-makes to the GM dealership, this will harm its goodwill or other intangible assets in three general ways. First, plaintiff argues that defendant's addition of the CDJR line-makes will cause various operational issues at the GM dealership that will harm plaintiff's customer goodwill or cause plaintiff's confidential information to be disclosed. (Doc. 15-2, at 17-19). Second, plaintiff asserts that defendant's addition of the CDJR line-makes to the GM dealership will commoditize plaintiff's products and dilute its trademarks. (*Id.*, at 18). Third, at oral argument plaintiff asserted that without an injunction defendant's alleged breach of the Agreements threatens plaintiff's contractual

6

relationships with its other franchisees.  The Court will address each of these arguments in turn.

### 1. *Operational Issues*

#### a. *Sales and Service Space*

Plaintiff argues that, after dualing the CDJR line-makes, there is not enough space to accommodate defendant's GM operations and CDJR operations.  Specifically, plaintiff argues that under the Agreements defendant must provide 2,703 square feet of indoor space to sell new GM vehicles, and the dualed setup provides only 1,208 square feet. (*Id.*, at 17-18).  Similarly, plaintiff alleges the Agreements require defendant to provide three indoor stalls for selling new GM vehicles, and the dualed operation only provides two.  (*Id.*, at 18).  Plaintiff argues that this setup, which places both GM vehicles and CDJR vehicles in the same sales space "commoditizes Chevrolet and Cadillac vehicles and is detrimental to the promotion and image of GM and its brands."  (*Id.*, at 18). Plaintiff also argues that the dualed operations provide only one service reception area for GM vehicles, which will result in longer wait times, which in turn could frustrate customers and harm plaintiff's goodwill.  (*Id.*).  Plaintiff claims that the layout of defendant's dualed operation across five separate buildings is inconvenient and will lead to a worse customer experience, again harming plaintiff's goodwill.  (*Id.*, at 18-19). Finally, plaintiff argues defendant's dualed operation will result in its confidential information being shared with defendant's employees who also have access to CDJR's confidential information.  (*Id.*, at 19).  Plaintiff's factual assertions rely entirely on the declaration of Michael Navari ("Navari"), plaintiff's Regional Dealer Network Manager for the North Central Region where defendant's dealership is located.  (Doc. 15-1).

Navari's declaration is based largely on his opinions and experience instead of articulable facts.  Navari asserts that defendant's various breaches of the Agreement will cause plaintiff irreparable harm based on his general "experience," his "belie[fs]," and

hypotheticals that have no factual basis in the record. (Doc. 15-1, at 10-12). Navari reaches other assumptions about irreparable harm based on nothing more than his *ipse dixit*. *See* (*Id.*, at 10) ("Adding a CDJR vehicle to a dealership show room that is already too small to meet GM's requirements . . . can only detract from [defendant]'s sales performance for Chevrolet. Likewise, the shortage of service write-up areas caused by the addition of CDJR will very likely result in longer waiting times and frustrated customers."). These statements have some basis in fact, i.e. the lack of space or service areas, but lack any explanation as to how these breaches inevitably lead to irreparable harm.

Although Navari reviewed an "allocation table," a spreadsheet showing how defendant will allocate space between the GM and CDJR operations, there is no indication that Navari has ever personally visited defendant's dealership either before or after defendant added the CDJR line-makes. Navari does not assert that plaintiff has actually received any complaints about the new layout despite defendant operating the dualed dealership for approximately seven weeks before oral argument on plaintiff's motion. The Court accords Navari's declaration little weight because "when the primary evidence introduced is an affidavit made on information and belief rather than on personal knowledge, it generally is considered insufficient to support a motion for a preliminary injunction." 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2949 (3d ed.).

In response, defendant offers the declaration of Kelly Bachelder ("Bachelder"). (Doc. 18-1). Bachelder's declaration is based on his personal knowledge as the dealer, president, and majority shareholder of defendant. (*Id.*, at 2). As to the lack of sales space, Bachelder states that defendant has not received any complaints about the layout since they began the dualed operations and that customers have enjoyed having all of defendant's operations in one location. (*Id.*). Bachelder also offers his opinion, based

8

on his experience as a car dealer in rural Iowa, that the total indoor and outdoor space is large enough to operate the dualed GM and CDJR dealership. (*Id.*, at 6-7). The Court is, of course, cognizant of Bachelder's potential bias, but accords more weight to Bachelder's specific experience in the relevant market and with the dealership at issue here than Navari's general experience with dealerships in the North Central Region.

As to plaintiff's claim that the dualed layout has inadequate service reception areas, Bachelder states that service wait times have gone down because the dualed operation allows defendant to have more service staff available in one place instead of spreading staff across two locations. (*Id.*, at 9-10). Bachelder also claims the service area requirements under the Agreements are unnecessary to provide a satisfactory experience because defendant provides service loaner vehicles to customers regardless of how brief the service is, so customers need not wait in the reception area. (*Id.*).

Defendant has also taken steps to avoid customer confusion with the dualed layout. Defendant has clear signage both indoors and outdoors to easily direct customers to their destination. (*Id.*, at 5). Defendant has staff at the entrance to each building to greet customers, and defendant has trained its staff to evaluate customer needs and direct them to the correct destination. (*Id.*).

Bachelder states that defendant "continues to protect its GM confidential information in the Main Building by allowing access to such information only to employees on a need-to-know basis." (*Id.*). Plaintiff has proffered no evidence to the contrary.

On the record before it, the Court cannot find that plaintiff has established that it is likely to suffer irreparable harm in the absence of an injunction. The Court finds the irreparable harm discussion in *Gen. Motors Corp. v. Harry Brown's, LLC*, 590 F. Supp. 2d 1134 (D. Minn. 2008), *aff'd*, 563 F.3d 312 (8th Cir. 2009), to be persuasive. In *Harry Brown's*, the defendant was a GM franchisee who sought to add Chrysler line-

9

makes to its GM dealership because it was not financially feasible to operate its GM and Chrysler dealerships separately. 590 F. Supp. 2d at 1136. GM rejected the defendant's proposal, stating that the combination of the GM and Chrysler operations would "dilute the image of a GM dealership portrayed to the community, reduce the space and capital available for inventorying and marketing GM products, and divert the single minded focus of sales and service management and staff . . . [i]n an increasingly competitive automotive business environment." *Id.* (alterations in original). The defendant proceeded with the dual, and GM filed suit and sought a preliminary injunction. *Id.* at 1137. GM argued that dualing the operations would cause irreparable harm in "loss of customer satisfaction, diversion of customer relationships, the loss of goodwill, the dilution of its trademarks, the destruction of its branding strategy, and the commingling of confidential and proprietary information." *Id.* at 1138.

The court in *Harry Brown's* noted that the affidavits of GM's employees "opine that customer goodwill and GM trademarks will be irreparably damaged merely because non-GM line-makes are sold and serviced from the same facility." *Id.* The Court found

> [t]he affidavits cite general principles of business, but fail to sufficiently establish that any of the already-dualing Minnesota GM dealerships have irreparably harmed GM in the manner averred here. Further, the affidavits fail to show that dualing at *this* dealership, approximately the thirty-first dualing dealership in Minnesota, will have an irreparable negative impact on GM customer goodwill, branding strategies, trademark dilution, or identification by customers.

*Id.* The court found GM failed to demonstrate irreparable harm and denied GM's motion for preliminary injunction. *Id.*, at 1138, 1141.

Plaintiff's irreparable harm allegations here are essentially the same as GM raised in *Harry Brown's*. In both cases, GM argues that the addition of the CDJR line-makes would result in inadequate space dedicated to GM sales, reduced customer satisfaction, dilution of GM's trademarks, disclosure confidential information, and damage to GM's

10

customer goodwill. *Compare* (Doc. 15-2, at 17-19) *with Harry Brown's*, 590 F. Supp. 2d at 1136, 1138. Like the court in *Harry Brown's*, this Court finds that speculation by plaintiff's employees based on general principles of business is insufficient to meet plaintiff's burden to demonstrate irreparable harm. This is particularly true given Bachelder's affidavit, based on personal knowledge and local experience, indicating that none of the alleged operational issues exist. Plaintiff has not pointed to any facts in the record to show that the lack of space dedicated to GM sales will cause any damage to GM's reputation or brand, or that GM customers have experienced longer service wait times since defendant dualed its operations. Plaintiff has likewise failed to show any customer complaints or confusion caused by the new dualed layout or any evidence that confidential information has been improperly shared. Navari's suppositions about the consequences of the addition of the CDJR line-makes are too speculative to show that irreparable harm is likely here.

Plaintiff argues that the Court should not rely on the district court's decision in *Harry Brown's* because the Eight Circuit Court of Appeals "acknowledged that it is 'acceptable for a district court to find a likelihood of irreparable harm based on general principles.'" (Doc. 20, at 5) (quoting *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 320 (8th Cir. 2009)). Plaintiff's argument ignores the remainder of Eight Circuit Court of Appeals' decision. The court noted:

> As to GM's claims of intangible injuries such as damaged goodwill, reputation, and trademarks, the district court was faced with conflicting opinions about the likely response of consumers to a dual showroom. The burden was on GM to establish the threat of irreparable injury, but the district court found that the GM affidavits stated only general business principles and were too speculative to establish such injury.

*Harry Brown's*, 563 F.3d at 319. Although the court noted it was acceptable for a district court to rely on general business principles, it affirmed the district court's decision

because "[p]art of the district court's discretion is assessing whether an alleged harm requires more substantial proof." *Id.* at 320. This Court, like the district court in *Harry Brown's*, is faced with plaintiff's opinions about how customers might respond to the dualed showroom, and Bachelder's testimony about the customer's actual response to it. The Court, in its discretion, finds that plaintiff's allegations are too speculative and require "more substantial proof" than plaintiff has provided. *Id.* Thus, the Court finds plaintiff has failed to establish it is likely to suffer irreparable harm without a preliminary injunction.[1]

Even if plaintiff could establish the existence of operational issues caused by defendant adding the CDJR line-makes, and thus devoting less space to GM sales and service, plaintiff also fails to establish that those issues will likely cause irreparable harm. The existence of some harm alone is not sufficient to warrant an injunction; plaintiff must show that the harm is both likely and irreparable. In *TrueNorth Companies, L.C. v. TruNorth Warranty Plans of North America, LLC*, 353 F. Supp. 3d 788, 802 (N.D. Iowa 2018), the plaintiff established that some of the defendant's customers were confused

---

[1] In finding no risk of irreparable harm, the district court in *Harry Brown's* found there was no discernable difference between the defendant's dealership and the thirty other GM dualed dealerships in Minnesota. 590 F. Supp. 2d at 1138. Likewise, plaintiff here has failed to differentiate defendant from the thirty-two other dualed GM dealerships in Iowa. As it did in *Harry Brown's*, plaintiff argues it approved many of the dualed dealerships under old policies in the 1980's and 1990's. (Doc. 20-1, at 3). Plaintiff alleges these duals were approved at "a much different time in the motor vehicle industry" (*id.*) but does not provide any explanation of what that means or why duals now cause irreparable harm. As to more recent duals, plaintiff does not require strict compliance with its contractual space requirements. Plaintiff allows duals when they "substantially" comply with the contractual space requirements but plaintiff provides no explanation about what it means to "substantially" comply. (*Id.*, at 4-5). Similarly, plaintiff states its decisions to approve proposed duals are "fact specific" but does not explain what factors go into those decisions. (*Id.*, at 4). As to plaintiff's allegations of insufficient space, plaintiff can only confirm that eleven of the thirty-two dualed dealerships in Iowa meet plaintiff's space requirements. (*Id.*, at 4). Absent any specific explanation of how defendant's dualed dealership is different from any of the thirty-two other dualed GM dealerships in Iowa, the Court cannot find defendant's conduct poses any additional harm to GM's goodwill.

12

about which company was which, and that the defendant had received many complaints and negative reviews on the internet. This Court recognized there was a possibility that defendant's unhappy customers could inadvertently recommend that others avoid doing business with plaintiff, but held "the record lacks any evidence to suggest that this is more than a speculative possibility and is negatively affecting [the plaintiff]'s business in an irreparable way." *Id.* at 803.

Other cases have likewise found that the existence of a circumstance that could cause harm alone is not enough to warrant a preliminary injunction absent evidence that the harm is likely. *See Doe v. Blake Sch.*, 310 F. Supp. 3d 969, 984 (D. Minn. 2018) (finding a requirement that students disclose disciplinary action on college applications did not warrant enjoining the defendant from imposing punishment because the record was speculative about whether the plaintiff's disciplinary record would prevent the plaintiff from being admitted to college); *Co-Mo Comm, Inc. v. City of Columbia*, Case No. 2:16-CV-04276-BCW, 2017 WL 1375200, at *6 (W.D. Mo. Apr. 14, 2017) (finding anecdotal evidence of confusion due to the defendant's use of an allegedly infringing mark, but finding no risk of irreparable harm because the plaintiff had not "demonstrated a palpable customer loss, or anything beyond speculative loss of good will"); *Watkins Inc. v. Lewis*, No. CIV.02-3708 (RHK/AJB), 2002 WL 31319491, at *10 (D. Minn. Oct. 11, 2002), *aff'd*, 346 F.3d 841 (8th Cir. 2003) (denying preliminary injunction to prevent termination of distributorship when movant presented only conclusory allegations about "customer calls expressing shock and concern over their termination" and unsubstantiated allegations "that customers who usually called them on a daily basis have stopped calling"). Here, even assuming there is some customer confusion or extended service wait times as a result of defendant's dualed layout, plaintiff has offered nothing more than speculation that these inconveniences will irreparably harm its brand or goodwill.

13

In short, plaintiff has provided only speculation that the addition of the CDJR line-makes will impede defendant's ability to properly sell and service GM line-makes. Even if plaintiff could demonstrate some interruption to defendant's GM operations, plaintiff has also failed to show that those interruptions are likely to result in irreparable harm.

### b.    Contractual Provisions

Plaintiff implies that the alleged operational issues and resulting irreparable harm must exist because plaintiff put the various requirements in the Agreements. *See* (Doc. 15-2, at 17-18) (arguing that adequately sized facilities are important because defendant agreed to provide premises that will promote plaintiff's image and goodwill, and arguing that the dualed layout must harm plaintiff's goodwill because it does not have sufficient showroom stalls and service reception areas). This argument fails as a matter of law.

A breach of contract and resulting damages are separate elements of a breach of contract claim. *Iowa Arboretum, Inc. v. Iowa 4-H Found.*, 886 N.W.2d 695, 706 (Iowa 2016) (citation omitted). Thus, the Court cannot imply that plaintiff has sustained damages, not to mention irreparable harm, merely because defendant allegedly breached the contract. To the contrary, a breach of an agreement does not, in and of itself, entail irreparable harm. *Timm & Assocs., Inc. v. Broad*, No. 05-2370 JRT/FLN, 2005 WL 3241832, at *3 (D. Minn. Nov. 30, 2005) (citing *Curtis Indus., Inc. v. Livingston*, 30 F.3d 96, 97 (8th Cir.1994) ("A former employee's breach of a restrictive covenant does not necessarily entail irreparable harm."). Even when a contract stipulates that a breach constitutes irreparable harm, such provisions alone are insufficient to establish irreparable harm for purposes of a preliminary injunction. *Minn. Vikings Football Stadium, LLC v. Wells Fargo Bank*, 157 F. Supp. 3d 834, 841 (D. Minn. 2016).

Here, plaintiff alleges that because defendant agreed to provide a specific number of service reception areas or stalls for new GM sales, plaintiff must be irreparably harmed if defendant does not provide those spaces. Under the Agreements, plaintiff "agree[d]

Case 6:20-cv-02039-CJW-KEM   Document 24   Filed 08/24/20   Page 14 of 24

to establish and maintain a clearly stated policy for determining reasonable dealer facility space requirements and to periodically re-evaluate those requirements to ensure that they continue to be reasonable." (Doc. 15-4, at 8). In 2017, plaintiff increased the space requirements at defendant's GM dealership. (Docs. 15-15, 18-1, at 8). Plaintiff, however, only informs its franchisees about their updated space requirements when the franchisee proposes a change to its dealership. (Docs. 20-2, at 3; 20-3).

Plaintiff does not explain how it determined the requirements for defendant's dealership, nor does plaintiff explain how defendant's failure to strictly comply with the requirements is likely to cause irreparable harm. Plaintiff's policy of not informing its franchisees about increases in their minimum space requirements indicates that plaintiff allows franchisees to operate below its calculated minimum space requirements indefinitely until the franchisee proposes a change to its dealership. This belies the fact that a franchisee's failure to strictly comply with the applicable space requirement does not, in and of itself, result in harm to plaintiff. In short, the Court cannot presume irreparable harm merely because defendant allegedly breached the Agreement.

### 2. *Commoditization and Dilution*

Plaintiff raises two related arguments about the effect of the addition of the CDJR line-makes at defendant's GM dealership. First, plaintiff argues that defendant adding the CDJR line-makes to the GM dealership will "commoditize[ ]" plaintiff's vehicles and is detrimental to the promotion of plaintiff's vehicles. (Doc. 15-2, at 18). Plaintiff similarly argues that selling plaintiff's vehicles from the same building as the CDJR line-makes commoditizes plaintiff's brands and dilutes plaintiff's trademarks.

### a. *Commoditization*

Plaintiff has not established that defendant adding the CDJR line-makes to the GM dealership is likely to commoditize plaintiff's vehicles. Plaintiff argues that combining the GM and CDJR brands makes purchasing a vehicle "like picking from a menu[.]"

(Doc. 15-1, at 11).  Defendant argues that vehicles are already commoditized.  (Doc. 18, at 11).

Even before dualing, defendant's CDJR operation was on the same parcel of land as the GM dealership.  (Doc. 18-1, at 3).  The CDJR dealership building was less than 180 feet from the GM dealership's main building.  (*Id.*).  Defendant's outdoor display of GM and CDJR vehicles is the same after dualing.  (*Id.*, at 3-4). Given the preexisting proximity of the CDJR and GM dealerships, it is unclear how defendant's dualing of the dealerships has any marginal impact on the commoditization of plaintiff's vehicles.  The GM and CDJR vehicles were already displayed in the same line of sight and sold within walking distance.  Thus, customers could easily shop both GM and CDJR line-makes when looking at a new vehicle.  Also, there is no dispute that there are already thirty-two dualed GM dealerships in Iowa alone allowing customers to shop and compare GM vehicles and other line-makes.  (Doc. 18-1, at 10-11).  Plaintiff offers no evidence that the addition of one more dualed dealership will have any marginal impact on the commoditization that has already taken place.  Thus, plaintiff has not met its burden to show that defendant's conduct causes any additional commoditization of its products.

### b.    *Trademark Dilution*

Plaintiff similarly argues that moving CDJR sales into the GM dealership dilutes plaintiff's trademarks.  Again, plaintiff relies entirely on speculation by Navari to support its allegation.  (Doc. 15-1, at 10).  The Court in *Harry Brown's* rejected a nearly identical argument because GM's allegations were based on speculation and did not explain how dualing at the defendant's dealership diluted GM's trademarks any more than the existing dualed dealerships.  *See* 590 F. Supp. 2d at 1138.  The Court finds plaintiff's speculation based on general principles of business insufficient to establish that defendant's addition of the CDJR line-makes will dilute plaintiff's trademarks any more than the thirty-two existing Iowa duals.

16

### 3. Other Franchises

At oral argument plaintiff argued, for the first time, that the Court's failure to enjoin defendant would irreparably harm plaintiff because it would undermine plaintiff's contractual relationships with its other franchisees. This argument fails for two reasons. First, plaintiff never raised this argument in its briefing or provided any legal support for it, and thus plaintiff waived this argument. *See Garrison v. New Fashion Pork LLP*, No. 18-CV-3073-CJW-MAR, 2020 WL 1494063, at *7 (N.D. Iowa Mar. 27, 2020) ("Plaintiff's failure to support his assertion waives this argument.").

Second, plaintiff offered no evidence to support a finding that any of its other franchisees would breach their agreements absent an injunction against this franchisee. Thus, plaintiff's allegations of irreparable harm are purely speculative and cannot support a preliminary injunction. *See Novus Franchising, Inc. v. Dean*, Civil No. 10-2834 (JRT/SER), 2011 WL 1261626, at *3 (D. Minn. Mar. 30, 2011) ("[Plaintiff] objects that the potential damage to the integrity of its franchising system constitutes irreparable harm. It argues that failure to enjoin the [defendants] will cause franchisees around the country to violate their non-compete agreements. However, this potential is . . . speculative. The Magistrate Judge appropriately noted that success on the merits of the claim is the proper deterrent for this potential harm, not injunctive relief."); *Anytime Fitness, Inc. v. Family Fitness of Royal, LLC*, Civil No. 09-3503 (DSD/JSM), 2010 WL 145259, at *3 (D. Minn. Jan. 8, 2010) ("[The plaintiff] argues that [the defendant]'s actions will cause other franchisees to ignore their noncompete agreements . . . causing its franchise system to unravel. This concern is speculative . . .. Further, success on the merits by the [plaintiff] in this case . . . would dissuade its franchisees from ignoring their agreements. Therefore, [the plaintiff] has not established irreparable harm."). If plaintiff ultimately prevails at trial, that success would be sufficient to uphold the integrity

of its franchise system.  *Id.*  Thus, the alleged irreparable harm to plaintiff's franchising system does not support the drastic remedy of preliminary injunction.

Plaintiff's burden is high in this case because the injunctive relief sought (forcing defendant to de-dual) is substantially the same relief it seeks at trial.  *See United Indus. Corp.*, 140 F.3d at 1179.  Plaintiff has not made the clear showing of irreparable harm necessary to justify the drastic remedy of a preliminary injunction.  *See Mazurek*, 520 U.S. at 972.  Plaintiff's inability to establish that it is likely to suffer irreparable harm, standing alone, is sufficient to deny plaintiff's motion.  *See Gelco Corp.*, 811 F.2d at 418.  The Court will, however, briefly discuss the remaining *Dataphase* factors.

## B.      Likelihood of Success on the Merits

Plaintiff has not met its burden to show a likelihood of success on the merits.  The Eighth Circuit has rejected the notion that the phrase "probability of success on the merits" should be read to mean that a movant can "prove a greater than fifty [percent] likelihood that he will prevail on the merits."  *Dataphase Sys., Inc.*, 640 F.2d at 113. More recently, the Eighth Circuit has explained that in cases not seeking to enjoin "government action based on presumptively reasoned democratic processes," courts should "apply the familiar 'fair chance of prevailing' test" to assess whether a movant has a likelihood of success on the merits.  *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008).  The "fair chance of prevailing" test "asks only whether a movant has demonstrated a 'fair chance of prevailing' in the ultimate litigation and . . . does not require a strict probabilistic determination of the chances of a movant's success when other factors, for example irreparable harm, carry substantial weight."  *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1053-54 (8th Cir. 2014) (citations omitted).  Here, the Court will first assess plaintiff's likelihood of success on its breach of contract claims and then address plaintiff's trademark infringement claim.

18

### 1. Breach of Contract

Plaintiff has not met its burden to establish a fair chance of success on two elements of its breach of contract claims. The elements of a breach of contract claim are:

> (1) [T]he existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Iowa Arboretum, Inc.*, 886 N.W.2d at 706 (citation omitted). Plaintiff has not shown that defendant breached an enforceable term of the Agreements, or that plaintiff suffered damages as a result of the breach.

Turning first to the breach element, the "[a]nalysis of whether a contract has been breached begins by determining whether the contract is enforceable." *Ag Spectrum Co. v. Elder*, 191 F. Supp. 3d 966, 970 (S.D. Iowa 2016), *aff'd*, 865 F.3d 1088 (8th Cir. 2017). Defendant argues that under Iowa Code Section 322A.22, the relevant contractual provisions are void, and thus cannot support a breach of contract claim. (Doc. 18, at 17-18). Motor vehicle manufacturers can only sell vehicles through licensed dealers who must be independent from the manufacturer. IOWA CODE § 322.3. Chapter 322A governs various aspects of the manufacturer-dealer relationship. Section 322A.22 states:

> A condition, stipulation, or provision in a franchise prohibiting or restricting the franchisee from continuing another line-make at the dealership or adding an additional line-make to the dealership is void. This section does not limit a franchiser from establishing good cause for the termination of a franchise pursuant to sections 322A.2 and 322A.11 on the grounds that the franchisee's dealership facility is not adequate to accommodate an additional line-make that has been added to the franchisee's dealership.

IOWA CODE § 322A.22.

19

Under the Agreements, defendant must provide certain information and plaintiff must approve in writing any change in the use of the dealership premises, "including addition of any other vehicle lines[.]" (Doc. 15-3, at 8). Requiring defendant to provide certain information and obtain plaintiff's approval before adding a new line-make appears to be a condition or provision restricting defendant from adding an additional line-make to the dealership. Thus, these terms appear to be void under Section 322A.22.

Plaintiff also argues that defendant violated the space requirements under the Agreements, but plaintiff concedes the space violations directly resulted from defendant's addition of the CDJR line-makes. *See* (Doc. 15-3, at 12-13) ("The . . . Agreements require that [defendant] meet specific facility size requirements, which it does not meet *following the addition of CDJR*. . . . The *combined Chevrolet, Cadillac and CDJR operations* also fail to meet GM facility requirements[.]" (emphasis added)). To the extent plaintiff is using the space requirements to prevent defendant from adding the CDJR line-makes, those provisions also appear void under Section 322A.22.

To the extent plaintiff is actually concerned about the lack of space devoted to GM operations, as opposed to being opposed to duals in general, Section 322A.22 provides plaintiff a remedy. Section 322A.22 allows plaintiff to terminate the Agreements "on the grounds that the franchisee's dealership facility is not adequate to accommodate an additional line-make that has been added to the franchisee's dealership." Plaintiff, however, has not pursued termination of the Agreements and instead endeavors to use the space requirements to prevent the addition of the CDJR line-makes in violation of Section 322A.22. Thus, it appears the relevant contractual provisions are void. Because the relevant terms appear to be void, defendant cannot have breached them, and plaintiff is not likely to succeed on the merits of its breach of contract claim.[2]

---

[2] Plaintiff also alleges that following the dual, defendant is operating the GM dealership away from the approved premises. (Doc. 15-2, at 12). Plaintiff's allegation is based entirely on the

Even if defendant did breach the contract, plaintiff has also not shown that it has suffered damages, irreparable or otherwise. "Offering evidence of damages is required to demonstrate a claim for breach of contract." *Iowa Arboretum, Inc.*, 886 N.W.2d at 706 (citation omitted). As the Court explained above, plaintiff has not demonstrated a risk of irreparable harm. Plaintiff has also failed to explain how it suffered any other harm, like lost sales, that could be remedied by an award of money damages. In the absence of any damages, plaintiff has failed to establish a likelihood of success on its breach of contract claims.

### 2. Trademark Claim

Plaintiff likewise fails to establish a likelihood of success on its trademark claim. Plaintiff's amended complaint asserts a claim for trademark infringement under Title 15, United States Code, Section 1125(a). (Doc. 14, at 20). Plaintiff's brief, however, ignores the elements of a claim under Section 1125(a) and instead argues plaintiff has a likelihood of success on a claim of trademark dilution under Section 1125(c). "The theory of dilution is distinct from trademark infringement." *Gateway, Inc. v. Companion Prods., Inc.*, 320 F. Supp. 2d 912, 925 (D.S.D. 2002) (citing *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 832 (8th Cir.1999)). Because plaintiff has not plead a dilution claim, the likelihood of success on such a claim is irrelevant to the Court's analysis.

Even if plaintiff plead a trademark dilution claim, plaintiff still has not shown a likelihood of success on the merits. The elements of trademark dilution are "(1) plaintiff owns a famous and distinctive mark, (2) defendant used a diluting mark in commerce, (3) that an association arose from the similarity of the two marks, and (4) that the association harms the reputation of or impairs the distinctiveness of the famous mark."

---

"allocation table" that defendant provided. (*Id.*). Defendant disputes that it has actually moved any of its GM operations from the approved premises. (Doc. 18-1, at 3-4). Plaintiff has not met its burden to show that this alleged breach occurred, and thus has not established it is likely to succeed on the merits.

*TrueNorth Cos., L.C.*, 292 F. Supp. 3d at 871 (citations omitted). Thus, there must be two marks at issue to assert a claim. Plaintiff has not identified how any of the CDJR marks are similar to its trademarks, nor has it explained how any of the CDJR marks harm the reputation or impair the distinctiveness of plaintiff's marks. Thus, plaintiff has not established a likelihood of success on a trademark dilution claim, even if plaintiff plead such a claim.

### C. Balance of Harms

The Court also finds that the balance of harms favor defendant. "[T]he balance of harms analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public." *Wachovia Secs., L.L.C.*, 571 F. Supp.2d at 1047. It is not the same analysis as the irreparable harm analysis. *Id.* The balance of harms analysis considers several factors including the threat of each parties' rights that would result from granting or denying the injunction, the potential economic harm to the parties, and whether the defendant has taken voluntary remedial action. *Id.* "[A]n illusory harm to the movant will not outweigh any actual harm to the non-movant." *Frank N. Magid Assocs., Inc. v. Marrs*, No. 16-CV-198-LRR, 2017 WL 3091457, at *5 (N.D. Iowa Jan. 9, 2017) (quoting *Interbake Foods, L.L.C. v. Tomasiello*, 461 F. Supp. 2d 943, 976–77 (N.D. Iowa 2006)).

Plaintiff has not demonstrated that the failure to grant an injunction will cause it significant harm. As the Court found, plaintiff has not shown that irreparable harm to its intangible assets is likely without an injunction. Likewise, plaintiff has not established that it will suffer any economic harm, like lost sales, in the absence of an injunction. On the other hand, defendant will suffer economic harm in the form of drastically increased operating costs if the Court forces defendant to de-dual its GM and CDJR operations. (Doc. 18-1, at 8-12). These increased costs would force defendant to close its CDJR operations. (*Id.*, at 11-12). This would harm other interested parties, including eight of

22

defendant's employees who would lose their jobs as well as defendant's CDJR customers who would lose access to local warranty and repair services. (*Id.*). Plaintiff's illusory allegations of harm are outweighed by the specific and concrete harms to defendant, defendant's employees, and the public. Thus, the balance of harms favors defendant.

### D. Public Interest

The public interest also favors denying plaintiff's motion. This Court has noted as follows:

> The "public interest" factor frequently invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious. However, there are more concrete considerations, such as reference to the purposes and interests any underlying legislation was intended to serve [and] a preference for enjoining inequitable conduct[.]

*Prudential Ins. Co. of Am. v. Inlay*, 728 F. Supp. 2d 1022, 1032 (N.D. Iowa 2010) (internal citations omitted). Plaintiff argues the public interest is in its favor because the public interest disfavors breaching contracts and because the public benefits from having more physical space in dealerships. (Doc. 15-2, at 21). Defendant argues that the public interest, as expressed by the Iowa legislature, favors denying the preliminary injunction. Specifically, defendant argues that the public policy expressed by Iowa Code Section 322A.22 favors a dealer's right to add additional line-makes, particularly in light of Iowa Code Section 322A.24 which provides that courts should construe Chapter 322A liberally.

The Court finds that public policy favors denying plaintiff's motion. For the reasons articulated in Section III(B)(1), it appears that Iowa Code Section 322A.22 protects defendant's right to add the CDJR line-makes. Although plaintiff may ultimately prevail at trial, it would undermine the underlying policy of Section 322A.22 to force defendant to de-dual its operations, especially because termination of the Agreements,

not injunctive relief, is the remedy provided by statute. Thus, the public interest weighs in defendant's favor.

## IV.  CONCLUSION

For these reasons, plaintiff's Motion for Preliminary Injunction (Doc. 15) is **denied.**

**IT IS SO ORDERED** this 24th day of August, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa